COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-154-CR

 

 

GAYLA BETH DODSON                                                        APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








Appellant Gayla Beth Dodson was charged by
indictment with tampering with a governmental record and aggravated
perjury.  The jury acquitted Appellant of
tampering with a governmental record and convicted her of aggravated
perjury.  The trial court sentenced her
to ten years= confinement in the
Institutional Division of the Texas Department of Criminal Justice and a $5,000
fine.  The trial judge suspended
imposition of confinement and placed her on community supervision for ten
years. 

Appellant brings three issues on appeal,
arguing that the trial court erred in admitting inadmissible hearsay, that the
evidence is legally insufficient under article 38.18 to support the verdict,
and that the trial court erred by instructing the jury on materiality.  For the reasons set forth below, we affirm
the trial court=s judgment.

Statement of Facts

On November 23, 2002, Appellant was working as
a dispatcher for the Young County Sheriff's Department, which provides dispatch
services to the Graham Police Department. 
Graham police officer Michael Viehmann, who worked the 3:00 p.m.B11:00
p.m. shift, attempted to contact the dispatcher several times while on
patrol.  Appellant responded slowly initially
and eventually did not respond at all. 
After Viehmann told another officer over the radio that dispatch was not
responding to him, Appellant immediately told Viehmann to come into the Young
County Sheriff's office.  Viehmann had
been talked to by his supervisor in the past about having problems with other
dispatchers, so he had turned on his car's video and audio recording system
before talking to Appellant.








At dispatch, Appellant confronted Viehmann
about what he had said over the radio. 
Viehmann called his supervisor, Assistant Chief Tony Widner, and told
him about the problem.  Appellant also
spoke with Widner at that time.  The 911
system was set up to record all radio traffic in addition to incoming 911
calls, and both Viehmann and Widner requested a copy of the radio traffic
recording from that evening.

Widner started an internal affairs
investigation the next working day in response to the incident.  In the course of that investigation, Viehmann
made a written statement and turned over the recording that he had made.  As for the 911 tape, Widner declined to go to
dispatch and listen to the original dispatch tape there; he instead again
requested a copy.  At some point when he
called the sheriff=s office for a copy, he heard
Appellant in the background say, AIf he
wants to listen to the tape, he can come over here and listen to it.@  When Widner did not receive any tape from
Appellant, he called to ask Sheriff Pettus about getting a copy of the tape;
Widner was told by dispatcher Teresa McGehee that the copy had been made and
that the sheriff had it.  Pettus
personally handed the tape to Widner.








The tape was about two or three minutes long
and did not include all the traffic stops that were recorded on Viehmann=s
in-car camera.  After discussing the tape
with his chief, Jim Nance, Widner asked Pettus to watch Viehmann=s
videotape.  At trial, Widner testified
that after seeing and listening to the tape, Pettus stated, AI
guess I didn=t get the whole story,@ and AI
guess I have been lied to.@  The internal affairs investigation into
Viehmann=s
conduct was closed.  The tape used by
Viehmann was put back into rotation to be re-used.

In 2004, Viehmann discussed the events with
Texas Ranger Aaron Dwayne Williams while the two were having lunch.  Williams then began an investigation into the
incident.  He presented his findings to
the Young County grand jury.  The grand
jury heard testimony from Richard Ferguson, a Graham police officer, that he
had heard the radio conversations between Appellant and Viehmann, and that a
couple of days later, he saw Appellant and Carolin Hight Teague at dispatch
with a tape recorder hooked up to the 911 system, taping an edited copy of what
was playing on the system.  Ferguson
recognized what he heard as the events of November 23.  Ferguson gave this same testimony at trial.








The tape used by Viehmann was turned over to
Williams, but by then it had already been taped over.  In February 2003, the 911 system had been
replaced, and the old system had been put into a storage room.  In April 2004, Jan Hammond, the IT administrator
for Young County, was asked to locate the old system and the tapes that had
been used with it.  She found the machine
in Chief Deputy Gary Barnett=s
office on the floor.  The top had been
taken off of the machine, and it looked to Hammond as though it had been pried
off.

Hammond found the tapes on a shelf in the
storage room.  That machine recorded on
two tapes simultaneouslyCan AA@ tape
and a AB@
tape.  The AA@ tape
from November 2002 had Abad@
written on it and had been erased.  The AB@ tape
was turned over to Williams.

Appellant testified to the grand jury that on
the night of the confrontation with Viehmann, she called Teague, another
employee of the Young County Sheriff=s
office, because she was upset, and Teague came to the station.  Appellant further testified that she did not
remember anyone asking for a copy of a tape, if anyone had asked her to make a
tape, she would have asked someone else to do it because she did not know how
to make a copy, she did not make a copy of a tape and did not remember
assisting anyone to do so, and she did not know who made the tape.  She also stated that she did not erase the
original 911 tape and did not know who did. 
Her grand jury testimony was read to the jury at trial.








Teague testified to the grand jury that on
November 23, 2002, she was assigned to the patrol division but was not working
that day.  After receiving a call from
Appellant that night, she ran dispatch for Appellant, who was upset.  Teague testified that she did not make the
recording, did not assist in making the recording, and was not present when it
was made.  She testified that she would
not call Ferguson a liar, that "if he saw [her] making [the tape], then
evidently [she] was," but she did not remember making the tape.  She also stated that she did not erase the
original 911 tape.  Her grand jury
testimony was read to the jury at trial.

At trial, four people who had worked with
Ferguson, including Ferguson's supervisor, testified that Ferguson's reputation
in the community for truth and veracity was bad.

Legal Sufficiency of
the Evidence Under Article 38.18








Appellant
argues in her second issue that the evidence is legally insufficient under
article 38.18 of the code of criminal procedure to support the verdict.  Article 38.18(a) provides that A[n]o
person may be convicted of perjury or aggravated perjury if proof that [her]
statement is false rests solely upon the testimony of one witness other than
the defendant.@[1]  Appellant argues that article 38.18 is
controlled by article 38.17, which provides, AIn all
cases where, by law, two witnesses, or one with corroborating circumstances,
are required to authorize a conviction, if the requirement be not fulfilled,
the court shall instruct the jury to render a verdict of acquittal, and they
are bound by the instruction.@[2]  The State argues that article 38.18 is merely
Aa
statutorily imposed sufficiency review and is not derived from federal or state
constitutional principles that define the legal and factual sufficiency
standards,@ much like the accomplice
witness rule.[3]  The State is only partially correct.  The accomplice witness rule specifically
states that in addition to an accomplice witness=s
testimony, there must be evidence tending to connect the defendant to the
offense.[4]  The accomplice witness rule is not a true
sufficiency test; it merely instructs in the determination of sufficiency.  That is, the accomplice witness=s
testimony must be disregarded in determining whether there is other evidence
tending to connect the defendant to the offense.[5]  The additional evidence does not have to be
legally or factually sufficient to sustain the conviction.[6]  It need only tend to connect the defendant to
the offense.[7]  








Article
38.18 is slightly different.  It
instructs that to sustain a conviction for perjury or aggravated perjury, the
State must produce more evidence than the testimony of the defendant and
another witness.[8]  But there is no corroboration requirement.[9]

The
State produced the testimony of Richard Ferguson.  In addition, the State offered Appellant=s
grand jury testimony, and that of Teague, Aincluding
their vacillating and implausible testimony and sudden loss of memory after
being confronted with the fact that Ferguson claimed to have seen them making
the record, which the grand jurors themselves apparently found to be
incredible.@  The State also points to testimony from
multiple witnesses that Appellant and Teague were together in the dispatch
office that Saturday night after Widner had requested a copy of the 911 tape,
as well as evidence from the B tape that Widner had made the request and that
Appellant had told the sheriff about it.








The
State also points to testimony that both Teague and Appellant attempted to
shift the blame to another dispatcher and testimony regarding the B tape and
its contents that proved that Appellant had testified untruthfully about other
aspects of the night=s events.  Additionally, the State relies on testimony
from Ranger Williams and from the defense expert that corroborated the
background voices on the tape, one of which Williams testified he recognized as
Ferguson=s.  The State also directs us to testimony from
multiple witnesses that Appellant was essentially the instigator of the initial
dispute and had motive to alter the tape to make herself look better and shift
blame to Viehmann, Teague was her good friend, and the two of them had the
opportunity to make the cassette tape that Saturday night before the tape
appeared in the sheriff=s office on the following
Monday morning.  

The
State argues that the jury was able to consider the entirety of the evidence
and compare Teague=s and Appellant=s
testimony and their similar losses of memory, their demeanor, and their grand
jury testimony.  We hold that the
evidence recited above is sufficient to satisfy article 38.18.  We therefore overrule Appellant=s
second issue.

Admissibility of Hearsay








In her
first issue, Appellant argues that the trial court erred in admitting, over
objection, a hearsay statement of Sheriff Pettus, who did not testify at
trial.  We have carefully examined the
record.  Assistant Chief Widner and Jim
Nance were allowed to testify over Appellant=s
hearsay objection that, at the meeting they had with Sheriff Pettus, after
listening to the cassette tape, Pettus stated, AI
guess I=ve
been lied to.@  As Appellant argues, the statement is clearly
hearsay.  The State conceded at trial
that the statement was hearsay by offering it as an exception to the
prohibition against hearsay evidence. 
The State offered the statement as a present sense impression, evidence
of then existing mental or emotional state, and an excited utterance.[10]

The
statement satisfies none of those exceptions. The State argues that Appellant
failed to preserve this complaint. 
Appellant did not object after the first time the statement was
offered.  Instead, she objected earlier,
in the middle of the statement. The witness testified that the sheriff said, AI
guess I didn=t get the whole story.  I guessC.@  Appellant objected
on hearsay grounds, her objection was overruled, and she requested a limiting
instruction.  Afterward, the rest of the
statement came in without additional objection. 
Under the facts of this case, we hold that the objection made mid-sentence
also applied to the rest of the statement that was admitted after the
objection.








Appellant also timely objected the second time the statement was
made.  But Appellant did not object to
the third mention of the statement. 
Because Appellant did not object to the third admission of the
statement, she has not preserved error.[11]  We overrule Appellant=s first issue.

 

Charge Error








In her
third issue, Appellant contends that the trial court improperly instructed the
jury that the statement in question, if any, made by Appellant, if it was made,
would be material.  Appellant argues that
because materiality is an element of the offense,[12]
an instruction that the statement in question was material instructed the jury
on an element to be determined by the jury and that the instruction therefore
violated Appellant=s right to due process under
the Constitution of the United States. 
We note that section 37.04(c) of the penal code provides that
materiality is a question of law.[13]  But, as Appellant points out, the United
States Supreme Court has held that whether a statement is material must be
submitted to the jury.[14]


The
case before this court is distinguishable in part from Gaudin because
Appellant=s jury was instructed in the
application paragraph that it must determine the materiality of the
statement.  But the jury was also
instructed that the statement under consideration was, in fact, material and
that the only issue was whether Appellant had made the statement.  We therefore hold that the charge was
erroneous.








Appellant
timely objected to this error, so we must determine whether Appellant suffered
any harm from the improper instruction.[15]  A properly preserved error will require
reversal as long as the error is not harmless.[16]  In making this determination, Athe
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@[17]

Appellant
argues that reversal is mandated by the Fifth Circuit decision in U.S. v.
Pettigrew.[18]  Pettigrew addressed the complete
withholding of the issue of materiality from the jury, resulting in the jury=s
rendering no verdict as to that element of the offense.[19]  In the case now before this court, however,
the jury did render a verdict as to the materiality element.  But the jury was instructed to render that
verdict if they found Appellant had made the statement in question.

The
State argues that materiality was never an issue in the case.  Materiality was unchallenged and
uncontested.  Based on our review of the
record, we agree.  Because materiality
was never an issue in this case, we hold, under the limited and unique facts of
this case, that Appellant suffered no harm from the erroneous instruction.  We therefore overrule
Appellant=s third issue.

Conclusion

Having overruled Appellant=s three issues, we affirm the trial court=s judgment.








LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

    CAYCE, C.J. concurs without opinion.

PUBLISH

 

DELIVERED: August
21, 2008











[1]TEX. CODE CRIM. PROC. ANN. art. 38.18(a) (Vernon 2005).





[2]Id. art.
38.17.





[3]See Cathey v. State, 992 S.W.2d 460, 462B63 (Tex. Crim. App. 1999), cert. denied, 528
U.S. 1082 (2000).





[4]Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).





[5]Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001).





[6]Id.





[7]Id.





[8]Tex. Code Crim. Proc. Ann. art. 38.18.





[9]See id.; see also Martin v. State, 13 S.W.3d 133, 140 (Tex. App.CDallas
2000, no pet.); Tamayo v. State, 924 S.W.2d 213, 216 n.1 (Tex. App.CBeaumont
1996, no pet.).





[10]See Tex. R. Evid. 803(1), (2), (3).





[11]See Fuentes v. State, 991 S.W.2d 267, 273 (Tex. Crim. App.), cert. denied, 528 U.S.
1026 (1999); Leday v. State, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998);
Ethington v. State, 819 S.W.2d 854, 858B59 (Tex. Crim. App. 1991). 





[12]See TEX. PENAL CODE ANN. ' 37.04
(Vernon 2003).





[13]Id. '
37.04(c).





[14]United States v. Gaudin, 515 U.S. 506, 522B23, 115 S. Ct. 2310, 2320 (1995)
(holding refusal to submit issue of materiality to jury unconstitutional); see
also Ward v. State, 938 S.W.2d 525, 530 (Tex. App.CTexarkana 1997, pet. ref'd) (noting
that section 37.04(c) is most likely not good law after Gaudin).





[15]See Almanza v. State, 686 S.W.2d 157, 171
(Tex. Crim. App. 1984) (op. on reh=g).





[16]Id.





[17]Id.; see
also Ovalle v. State, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).





[18]77 F.3d 1500 (5th Cir. 1996). 





[19]Id. at 1511.